# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| LINDA DEJANA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:11-CV-1690-JAR |
| | ) | |
| MARINE TECHNOLOGY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Randy M. Scism's Motion for Summary Judgment [148], Defendant Marine Technology, Inc.'s Motion for Summary Judgment [154], Plaintiffs' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment [166], Plaintiffs' Motion to Strike Defendants' Proposed "Sur-Rebuttal" Expert Reports of Brant Savander and Anthony Caiazzo [138], Plaintiffs' Motion to Exclude Parts of Thomas Ireland's Expert Testimony [146], Plaintiffs' Motions to Exclude Testimony and Opinions of Anthony Caiazzo [155], Christopher Long [165], and Brant Savander [168], and Defendants' Motions to Exclude Expert Testimony of Eric Greene [158], Anand Shah, P.E. [159], Scott Graham, P.E. [160], Lane Hudgins [161], and Donald Barceloux, M.D. [162] The motions are fully briefed and ready for disposition. Oral argument on the motions was held on October 16, 2013.

### I. Motions for summary judgment

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light

most favorable to the nonmoving party. The moving party has the burden to establish both the absence of a genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v Carrett</u>, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material facts exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, the Court does not weigh evidence and decide the truth of the matter, but rather only determines if there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249.

**A**. **Defendant Randy M. Scism's motion for summary judgment**

Scism's motion is based on the belief that Plaintiffs' theory of liability against him is premised on the doctrine of piercing the corporate veil. Piercing the corporate veil allows a plaintiff to impose liability for a corporation's obligations, or for torts committed by the corporation, on some other company or individual that controls and dominates the corporation. <u>See</u>, <u>e.g.</u>, <u>Churchill in Crestwood, LLC v. Schwartz</u>, 2011 WL 7109212, *5 (W.D. Mo. Jan. 27, 2011); <u>In re Mar-Kay Plastics, Inc.</u>, 234 B.R. 473 (Bkrtcy. W.D. Mo. 1999). Scism argues he cannot be held personally liable on Plaintiffs' claims because he was acting solely as a corporate officer and sole shareholder of MTI. (Memorandum in Support, Doc. No. 150, p. 3) Plaintiffs respond that Scism can be held individually liable, without piercing the corporate veil, because he personally participated in the design, manufacture and testing of the subject boat, as well as the aftermarket window bars. (Plaintiffs' Memorandum in Opposition, Doc. No. 175, p. 4, 6-7)

It is well established that a corporate officer or director does not incur personal liability for the corporation's torts merely by reason of his official status. His liability, if any, stems from his

own tortious conduct. "A corporate officer is individually liable for the torts he [or she] personally commits [on behalf of the corporation] and cannot shield himself [or herself] behind a corporation when he [or she] is an actual participant in the tort. The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of *respondeat superior*; it does not however relieve the individual of his [or her] responsibility." U.S. v. Northeastern Pharmaceutical & Chemical Co., Inc., 810 F.2d 726, 744-45 (8th Cir. 1986) (citations omitted).

Plaintiffs allege that MTI and Scism designed and built the subject boat, and that, at all material times, MTI acted by and through Scism. (Second Amended Complaint[1] ("SAC"), Doc. No. 105, ¶ 24) Plaintiffs further allege that, at all times material to this lawsuit, Scism served as MTI's president, chief spokesman and promoter, was the "guiding force" behind MTI, and actively participated in all aspects of the business including the design, construction and sale of MTI race and pleasure boats, including the subject boat. (SAC, ¶ 25) Plaintiffs assert claims for wrongful death and damages against *both* MTI and Scism based on strict liability for design and manufacturing defect, strict liability for failure to warn, negligence for defective product, negligence for failure to warn, and punitive damages. (SAC, ¶¶ 108-266) Because this alleged personal liability is distinct from the derivative liability that results from piercing the corporate veil, Scism's motion for summary judgment will be denied.

### B. MTI's Motion for Summary Judgment

---

[1] While captioned "Second Amended Complaint," this is actually the third amended complaint filed by Plaintiffs. (See Doc. Nos. 1, 4)

MTI moves for summary judgment on three grounds: (i) Plaintiffs' theory of product liability fails because there is no duty in Missouri to recall or retrofit a product once it has left the manufacturer's control; (ii) Plaintiffs cannot claim lost accumulations to Graff's estate because such damages are not recoverable under Missouri's wrongful death statute; and (iii) without relevant or reliable expert opinion testimony, Plaintiffs cannot prove the boat was in a defective condition and unreasonably dangerous. (Mem. in Supp., Doc. No. 157, pp. 1-3)

**Duty to recall or retrofit**

Plaintiffs allege that Defendants knew the 2005 model year enclosed cockpit canopy safety system employed on the boat was fatally defective after a customer, Randy Linebaugh, was killed in a similar accident in 2004, yet did nothing to recall, repair or retrofit existing boats with their new canopy design. (SAC, ¶¶ 11, 73, 74, 87)

In support of their motion for summary judgment, MTI argues that as a manufacturer, it is not required to recall or retrofit a product with additional safety features that were not required at the time of manufacture. (Mem. in Supp., pp. 4-7) Even assuming a duty to recall or retrofit the boat, MTI maintains it did so by installing window bars inside the canopy and that Plaintiffs' removal of this safety feature is fatal to their case.[2] (Id., p. 6)

---

[2] Courts have held that a manufacturer or seller is not liable for injuries caused by a defective product if the defect was created by an alteration which amounts to an intervening or superseding cause, as distinguished from a concurrent cause, of the injuries. See Winters v. Sears, Roebuck and Co., 554 S.W.2d 565, 572 (Mo.Ct.App. 1977). See also In re Genetically Modified Rice Litigation, 666 F.Supp.2d 1004, 1024 (E.D. Mo. 2009) ("Under Missouri law, the mere existence of an intervening act is not decisive. For an intervening act to relieve the original tortfeasor from liability, it cannot be an act of concurring or contributory negligence.") (internal quotations omitted). Nevertheless, the question of whether a party's negligence constitutes a superseding cause of the injury is a question of fact. Lone Star Industries, Inc. v. Mays Towing Co., Inc., 927 F.2d 1453, 1462 (8th Cir. 1991).

There is no common law duty to recall under federal or Missouri law absent a mandated recall by a governmental agency. See Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 773-74 (8th Cir. 1998). In Horstmyer, 151 F.3d 765, plaintiff was injured when his hand came in contact with the spinning blade of a miter saw. Seven years earlier, Black & Decker had recalled the model of saw that injured plaintiff; however, the saw plaintiff was using at the time of his injury was never made part of the recall. Id. at 767. Plaintiff sued for "negligent recall." Prior to trial, Black & Decker successfully moved to dismiss the claim for failure to state a cause of action. Id. at 768. On appeal the court concluded that while there may be a duty to recall in some cases, there was "no indication, by caselaw, statute, or otherwise, that the Missouri Supreme Court would create a common law duty to recall under these circumstances." Id. at 773. Further, because there was no recognized duty to recall, Black & Decker could not be held to have assumed such a duty by voluntarily recalling some of the saws. Id. at 774. See also Smith, 755 F.2d at 135 (upholding district court's refusal to instruct jury on failure to recall "because no duty to recall the rims existed under state or federal law"); Efting v. Tokai Corp., 75 F. Supp.2d 1006, 1011 (W.D. Mo. 1999) ("Because there is no duty in Missouri to recall or retrofit the Aim N Flame, defendants' motion for summary judgment on the claim for failure to recall or retrofit will be granted."); Stanger v. Smith & Nephew, Inc., 401 F. Supp.2d 974, 982 (E.D. Mo. 2005) ("The Court agrees with defendants that under Missouri law, there is no cause of action for negligent recall."). In this case, however, MTI's liability may be based on its defective design and manufacture of the enclosed cockpit/canopy safety system. The Court concludes there are fact issues as to whether the boat, as originally designed and manufactured, was defective, which preclude summary judgment.

**Damages**

On the issue of damages for net lost accumulation to Graff's estate, MTI argues that in Missouri, the damages recoverable in wrongful death cases are governed by R.S.Mo. § 537.090 and do not include losses to an estate or survivorship losses. MTI cites Powell v. American Motors Corp., 834 S.W.2d 184, 186 (Mo. banc 1992), in support of its position that Missouri's statute provides for survivorship damages incurred by the decedent before death, but not for damages caused by the death itself. (Mem. in Supp., pp. 7-9) Plaintiffs respond that § 537.090 allows for recovery of "damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death," and does not expressly preclude damages for "net loss accumulation" to an estate. (Opp., Doc. No. 186, pp. 10-12)

At oral argument, counsel for Plaintiffs acknowledged that the Graff estate cannot claim lost accumulations for *itself* under the wrongful death statute, and clarified that Plaintiffs' claim for lost inheritance is made on behalf of Graff's survivors. Plaintiffs rely on Moss v. Executive Beechcraft Inc., 562 F.Supp. 873 (W.D. Mo. 1983), which holds that under Missouri law, a beneficiary's loss of an expected inheritance, if properly supported by the evidence, is recoverable as an element of damages in a wrongful death action. See also Bagley v. St. Louis, 186 S.W. 966 (Mo. 1916) (recognizing rule but denying recovery).

The majority of courts that have addressed this issue have found that a beneficiary's loss of expectancy of an inheritance from the decedent is a proper element of damages in a wrongful death action. See Anno., Wrongful Death Damages for Loss of Expectancy of Inheritance from Decedent, 42 A.L.R.5th 465 (1996). These damages are generally confined to the present value of

what the beneficiary probably would have inherited from the decedent, based upon future additions that the decedent would likely have made to his or her estate had he or she not died prematurely. Id. The district court in Moss acknowledged the speculative nature of such damages, but stated that "plaintiffs should at least be afforded the opportunity to present evidence in support of this element of damage. It will be for the jury to determine if [decedent] had lived to her life expectancy whether she would have amassed an inheritable estate and whether each claimant would continue to be the natural object of her affections and beneficence if each had lived out their life expectancy." 562 F.Supp. at 875. Accordingly, MTI's motion for summary judgment will be denied.

**Lack of expert evidence**

Lastly, MTI argues Plaintiffs have failed to support their theory of liability with reliable, scientific evidence. Without expert testimony, Defendants contend Plaintiffs will be unable to prove the boat was in a defective condition and unreasonably dangerous. (Mem. in Supp., pp. 10-13) Plaintiffs respond that their experts exceed the standards for admissibility under Daubert,[3] but even if they are excluded, they can still prove their case by circumstantial evidence, citing Patterson v. Foster Forbes Glass Co., 674 S.W.2d 599, 604 (Mo.Ct.App. 1984). The Court has addressed these arguments in connection with Defendants' motions to exclude the opinion testimony of Plaintiffs' experts Greene, Shah and Graham. As discussed *infra*, after reviewing Defendants' motions, the Court concludes that Plaintiffs' experts possess the required expertise

---

[3] Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

and have applied reliable methods to the facts of this case to form their opinions. Thus, MTI's motion for summary judgment will be denied.

### C. Plaintiffs' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment

Plaintiffs move for summary judgment on Defendants' counterclaims for contribution for negligence. Alternatively, Plaintiffs move for partial summary judgment on five of the Defendants' affirmative defenses[4] which go to Plaintiffs' negligence, and on the following issues: whether the original design of the subject boat was defective; whether the second collision doctrine is applicable; whether Plaintiffs' use of the boat was reasonably foreseeable; whether Plaintiffs would have survived the rollover had the canopy not collapsed; and whether Plaintiffs were negligent. In response, Defendants argue that based on the general nature and tort theory of this case, the evidence raises multiple fact issues which precludes summary judgment. The Court agrees.

### Original design defect

Plaintiffs claim summary judgment in their favor is appropriate because the original design of the boat was defective. Plaintiffs point to Defendants' noncompliance with the Lanvin

---

[4] Defendants' fourth affirmative defense is based on Plaintiffs' comparative or contributory negligence; the eighth affirmative defense is based on Plaintiffs' failure to exercise the degree of care for their safety that a reasonably prudent person would have exercised under similar circumstances; the eighteenth affirmative defense is based on Plaintiffs' comparative fault; the twenty-first affirmative defense is based on indemnity/contribution from Dejana for his negligence causing Graff's death; and the twenty-second affirmative defense is based on indemnity/contribution from Graff for his negligence in causing Dejana's death.

guidelines[5] (Mem. in Supp., Doc. No. 167, pp. 10-13), and to the fact that the aftermarket window bars were developed in response to the Linebaugh crash. (Id., pp. 13-14) Plaintiffs also contend that Defendants failed to provide any warnings regarding the boat's horsepower and speed limitations or of the risk of removing the bars from the windshield. (Id., pp. 14-15)

In response, Defendants state that whether a defect existed in the boat is a fact-specific question for the jury to determine, with the help of engineering expert testimony. (Response, Doc. No. 184, p. 4) Defendants note the Lanvin guidelines for powerboat manufacturers are not laws or mandates governing the design of the boat, as Plaintiffs suggest. In addition, Defendants identify two witnesses, Billy Mauff and Kevin Cooper, whose testimony they contend will controvert and create a fact issue regarding Plaintiffs' failure to warn allegations. According to MTI, Mauff and Cooper specifically warned Decedent Dejana on the weekend of the race that removing the bars from the windshield of the canopy would be fatal in the event of a rollover. (Response, pp. 5-6; Defendants' Statement of Additional Uncontroverted Material Facts (SAF), ¶¶ 121, 122)

In reply, Plaintiffs maintain there is no dispute that the boat hull, polycarbonate windshield and canopy failed, causing Decedents' injuries, that the aftermarket window bars were developed in response to the Linebaugh crash, and that if the window bars had been installed on the subject boat, then Decedents would have survived. Plaintiffs argue this "necessarily means" the boat, as it existed at the time of the crash, was defective. (Reply, Doc. No. 206, pp. 2-3)

Under Missouri law, to recover under the theory of strict liability for defective design, a plaintiff must establish that: "(1) the defendant sold the product in question in the course of its

---

[5]The Mark Lavin Memorial Safety Foundation Competitor Compartment System Guidelines (the "Lavin Guidelines") for enclosed reinforced restrained cockpit systems.

business; (2) the product was then in a defective condition, unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold." American Auto. Ins. Co. v. Omega Flex, Inc., 2013 WL 3287161, at *1 (E.D. Mo. Jun. 28, 2013) (citations omitted). Whether a product is unreasonably dangerous is the determinative factor in a design defect case. Hylton v. John Deere Co., 802 F.2d 1011, 1015 (8th Cir. 1986) (citing Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 375 (Mo.banc 1986)). The concept of "unreasonably dangerous" is not clearly defined by Missouri courts or the Eighth Circuit; however, courts appear to be consistent in holding that it is for a jury to decide the ultimate issue of what constitutes "unreasonably dangerous" in a design defect case. Ford v. GACS, Inc., 265 F.3d 670, 676-77 (8th Cir. 2001); See also, Pree v. Brunswick Corp., 983 F.2d 863, 866 (8th Cir. 1993) ("Unless a court can affirmatively say as a matter of law that the design renders a product 'unreasonably dangerous,' the question is generally one for the jury.").

As discussed *infra*, there will be opposing expert witnesses, subject to cross-examination, who have widely differing opinions on the design of the cockpit canopy, the strength of the composite structure of the boat's deck and hull, the speed of the boat at the time of the accident, and the effect of the removal of the window bars from inside the canopy windshield. Because the Court cannot affirmatively say as a matter of law that the original design of the boat rendered it "unreasonably dangerous," Plaintiffs' motion for summary judgment on this issue will be denied.

**Second collision doctrine**

Next, Plaintiffs claim that because the boat was being used in a foreseeable manner at the time of the accident, the second collision doctrine applies to bar evidence of Decedents'

contributory fault. (Mem. in Supp., pp. 15-18) In response, Defendants contend the public policy behind the second collision doctrine, created and applied to automobile manufacturers, does not apply to the niche industry of offshore powerboat racing. (Response, pp. 7-9) Defendants also argue that unlike other second collision doctrine cases which isolate one product defect that caused an enhanced injury, Plaintiffs' arguments extend to multiple defects, including problems with the deck hatches, structure and strength, isolation of the canopy structure, bolting of the windshield to the canopy, strength of the windshield, and strength of the boat laminate. (Id., pp. 9-11) Lastly, Defendants argue that evidence of Decedents' comparative fault or the initial cause of the crash is highly probative of the issues in this case and must not be excluded under the second collision doctrine, citing Graham v. Hamilton, 872 F.Supp.2d 529 (W.D. La. 2012), where the court allowed evidence of decedent's comparative fault in a wrongful death action based on the second collision doctrine. (Doc. No. 184, pp. 11-13)

The second collision doctrine applies when the construction or design of a product enhances an injury beyond that which would have otherwise occurred as the result of an accident. See, Bass v. General Motors Corp., 150 F.3d 842, 846 (8th Cir.1998) (citing Polk v. Ford Motor Co., 529 F.2d 259, 264 (8th Cir.1976) (en banc)). The doctrine  has been extended to a broad range of product areas, including boats. See, e.g., Rubin v. Brutus Corp., 487 So.2d 360, 364 (Fla.Ct.App. 1986) (boat) ("[T]he basic duty underlying this legal theory is the same—to use reasonable care in the design and manufacture of a product to protect against a foreseeable risk of injury in a collision.") See also, Hillrichs v. Avco Corp., 478 N.W.2d 70 (Iowa 1991) (farm equipment); Bruce v. Martin-Marietta Corp., 544 F.2d 442 (10th Cir. 1976) (airplanes); Camacho v. Honda Motor Co., 741 P.2d 1240 (Colo. 1987) (motorcycles). Moreover, Defendants provide

no legal basis for their contention that a fact pattern involving allegations of multiple defects precludes application of the second collision doctrine. Whether Decedents' injuries and death were caused by one specific defect or a combination of defects does not, in the Court's view, change the applicability of the second collision doctrine to the facts of this case.

The elements necessary for recovery under the second collision doctrine are the same elements that must be established in a design defect case. "To recover under the second collision doctrine, the plaintiff has the burden of proving that the product was defective in condition or design when it left the manufacturer. To establish that the product was defective, plaintiff must show that he was injured while using the product in its intended manner. Further, the plaintiff must prove that the product was unreasonably dangerous." Richardson v. Volkswagenwerk, A.G., 552 F.Supp. 73, 80 (D.C. Mo. 1982). See also, Cryts v. Ford Motor Co., 571 S.W.2d 683, 688 (Mo.Ct.App.1978); McDowell v. Kawasaki Motors Corp. USA, 799 S.W.2d 854, 865 (Mo.Ct.App.1990). Whether the application of the doctrine will bar evidence of Decedents' fault depends on the resolution of substantial factual issues regarding the boat's design. Thus, the Court will deny Plaintiffs' motion as to the application of the second collision doctrine. At oral argument, Plaintiffs voiced concern about the jury hearing evidence of Decedents' conduct alleged to have contributed to the crash. Should the Court determine that the second collision doctrine applies in this case, it will consider a curative instruction to the jury or other remedy to address those concerns.

**Decedents' alleged negligence**

Finally, Plaintiffs claim summary judgment is appropriate because there is no evidence to establish that Decedents' alleged negligence, specifically their modifications to, and lack of

familiarity with the boat, or Decedent Graff's THC levels, caused or contributed to cause their injuries and deaths. (Doc. No. 167, p. 19) Defendants dispute this claim and highlight the following factual issues:

- Decedents increased the weight and size of the engines and then practiced operating the boat with the new engines for only one and a half hours prior to racing it. (SAF ¶¶ 125, 127, 129, 130)

- MTI's expert, Dr. Savander, opined that the added weight from the new engines decreased the margin of error when handling the boat. (SAF ¶129)

- MTI's racing expert, Jeff Harris, opined that Decedents did not have the requisite experience with the larger engines to race the boat in race conditions. (SAF ¶¶ 129, 130)

- Decedents removed the window bars, a safety device, from the boat. (SAF ¶¶121, 122, 123, 132)

- MTI's experts opine that the windshield would not have failed had Decedents not removed the window bars. (SAF ¶132)

- Mr. Mauff and Mr. Cooper, long-time racers, testified they each separately warned Decedents that they could be killed from the windshield imploding during a rollover accident without the windows bars in place. (SAF ¶¶121, 122)

(Doc. No. 184, pp. 14-15) The question of negligence is ordinarily a question of fact to be decided by the jury, and is always a question of fact when the evidence on the issue is conflicting. See Kiemele v. Soo Line R. Co., 93 F.3d 472, 474 (8th Cir. 1996). Because there are genuine issues of material fact as to whether Decedents were comparatively at fault, Plaintiffs' motion will be denied.

**II**. **Plaintiffs' Motion to Strike Defendants' Proposed "Sur-Rebuttal" Expert Reports of Brant Savander and Anthony Caiazzo**

By way of background, Plaintiffs' liability experts, reconstructionist Kevin Breen, composite expert Andrew Shah, and naval architect Eric Greene, opine that the failure of the

boat's enclosed cockpit/canopy safety system was the direct and proximate result of the defective design of the boat and canopy system by Defendants. Their opinions are based on traditional forensic and failure analyses, accident reconstruction, and photogrammetric techniques. (Motion to Strike and Mem. in Supp., Doc. No. 138, p. 5) Defendants endorsed two experts, Dr. Brant Savander, an expert in computational fluid dynamics (CFD), and Dr. Anthony Caiazzo, an expert in finite element analysis (FEA), who rely exclusively on the results of computer simulations created using CFD and FEA software programs known as Starccm+ and ABAQUS, for their opinions. (Id., p. 6) Because Plaintiffs' experts did not use or address these computer programs in their reports, Plaintiffs requested and the Court granted them an opportunity to submit rebuttal testimony on the limited issue of computer simulation, animation, and modeling created by those software programs. (Fourth Amended Case Management Order, Doc. No. 130) Plaintiffs retained Scott Graham as a rebuttal expert. In addition, one of Plaintiff's original experts, Eric Greene, filed a rebuttal report. Defendants' experts Savander and Caiazzo then submitted revised reports, which Plaintiffs move to strike as improper sur-rebuttal.

Plaintiffs maintain that neither Graham nor Greene raise "new" matters in their expert rebuttal reports that would justify a sur-rebuttal, and that Defendants' sur-rebuttal reports are really an improper attempt to correct flaws in the methodology of their original reports. (Mem. in Supp., p. 11) The decision to allow a party to present evidence in sur-rebuttal is generally a matter within the Court's discretion. U.S. v. Purkey, 428 F.3d 738, 759 (8th Cir. 2005) (citing United States v. Wilford, 710 F.2d 439, 452 (8th Cir.1983), cert. denied, 464 U.S. 1039 (1984)). "[S]urrebuttal is typically thought appropriate only when new matters are raised in the rebuttal testimony." Id. (citing United States v. Barnette, 211 F.3d 803, 821 (4th Cir.2000)).

Both Graham and Greene opine that CFD and FEA software modeling is not sufficiently reliable to be used as the primary and exclusive methodology in a case like this due to the large number of unknown initial variables and the presence of waves and boat wakes. Graham noted a number of methodological flaws in Savander's use of the CFD software. In particular, none of Savander's assumed key initial conditions and inputs were based on recorded data from the subject boat. (Graham Report, Doc. No. 138-6, pp. 5-6) Graham concluded that Savander's proposed hypothesis of looking at several load cases (speeds), and determining in what case (speed) the predicted damage matched the actual, was inadequate given the complexities of the instant case.

With respect to Caiazzo, Graham concluded that his analysis of the overall boat structure using the ABAQUS software program was fundamentally flawed because it failed to account for the progressive nature of the boat's structural failure. (Graham Report, Doc. No. 138-7, p. 6) Further, because Caiazzo's analysis of the crash and subsequent damage predictions is based on Savander's four flawed pressure predictions from his CFD simulations, that analysis is likewise flawed and unreliable. (Id.) Greene concluded in his rebuttal report that the analyses presented by Savander and Caiazzo were not based on how the boat was built or the events that occurred on August 24, 2008. Thus, the damage predicted by the software "models" does not correspond to damage incurred during the accident, nor are the damage mechanisms presented credible. (Greene Report, Doc. No. 138-8, p. 4)

Defendants respond that their experts were left to consider Graham's untested theories rebutting their work because, as Graham admitted, he did not run the additional calculations he suggested, and simply offered opinions that specific factors would have altered the findings and

results of the CFD and FEA analyses. Defendants contend their sur-rebuttal reports constitute "narrow and limited contradiction to Plaintiffs' rebuttal opinions,"[6] and conduct the additional calculations which Graham failed to perform. (Resp. in Opp., Doc. No. 140, p. 8)

Plaintiffs reply that given their rebuttal experts' opinions that CFD and FEA computer modeling and simulations are not sufficiently reliable and amount to "junk science," their experts would never run such tests, and the fact they did not is only further evidence that sur-rebuttal is improper. Defendants' experts had already used this methodology and obtained results. Defendants took the opportunity of a sur-rebuttal to run more tests, and correct the flaws in their previous computations. (Reply, Doc. No. 141, p. 7)

Upon careful review of Graham and Greene's rebuttal reports, it appears to the Court that they are essentially criticizing Savander and Caiazzo's methodology and that they reached their conclusions without introducing new issues, facts or evidence into the case. Graham and Greene did not perform any testing with the Starccm+ or ABAQUS programs. If they had, then the results of that testing could arguably be considered newly introduced evidence which Defendants could then attempt to contradict through sur-rebuttal. Sur-rebuttal testimony is not an opportunity for the correction of any oversights in the adverse party's case-in-chief. <u>In re President Casinos, Inc</u>., 2007 WL 7232932, at *2 (Bkrtcy.E.D.Mo. 2007) (quoting <u>Crowley v. Chait</u>, 322 F.Supp.2d 530, 531 (D.N.J. 2004)). Testimony that only offers additional support to an argument made in a case-

---

[6] Defendants' sur-rebuttal reports can hardly be considered "narrow and limited." Savander's report is in excess of 200 pages (Doc. No. 138-20, -21), and Caiazzo's report is 26 pages. (Doc. No. 138-22)

in-chief is improper on rebuttal. <u>See</u> <u>Peals v. Terre Haute Police Dept</u>., 535 F.3d 621, 630 (7th Cir. 2008).

Accordingly, Plaintiffs' motion to strike Defendants' "sur-rebuttal" expert reports will be granted. Defendants remain free to challenge Plaintiffs' rebuttal expert opinions on cross examination, but may not augment their rebuttal cross-examination with the results of the additional calculations performed by Savander and Caiazzo as those would constitute new opinions.

### III. Daubert motions

The parties have filed numerous <u>Daubert</u> motions directed to each other's experts. The Court applies the standard of <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999), as set forth in <u>Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.</u>, 394 F.3d 1054, 1057 (8th Cir. 2005): "The opinion of a qualified expert witness is admissible if (1) it is based upon sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has applied the principles and methods reliably to the facts of the case." <u>See</u> <u>also</u> <u>Russell v. Whirlpool Corp</u>., 702 F.3d 450, 456 (8th Cir. 2012) ("There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant."). When evaluating the sufficiency of expert testimony, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." <u>Minn. Supply Co. v. Raymond Corp.</u>, 472 F.3d 524, 544 (8th Cir. 2006) (quotation omitted). Each motion will be considered in turn below.

**A. Plaintiffs' motions to exclude opinion testimony**

**Thomas Ireland**

Defendants retained economist Thomas Ireland to evaluate Plaintiffs' alleged economic loss. With respect to Linda Dejana, Dr. Ireland concludes there is no reliable evidence that she suffered any financial loss as a result of her husband's death. (Report of Dr. Ireland, Doc. No. 146-2, p. 8) He reached this conclusion by comparing the Dejanas' family income in the two year period before and after Philip Dejana's death in 2008. (Id., pp. 9-10) The average adjusted gross income (AGI) of Philip and Linda Dejana for the period before his death was $378,502. After subtracting 9.5% for Philip Dejana's personal consumption expenses, that figure becomes $342,544. The average AGI for Linda Dejana for the period after her husband's death was $383,839. Thus, the resulting two year comparison shows a net gain rather than a net loss to Linda Dejana after Philip Dejana's death.

Plaintiffs argue that Ireland's failure to consider the source of Linda Dejana's post-death income, and his failure to separate Philip Dejana's earnings from Linda's in his economic loss analysis, results in the misleading conclusion that there is "no evidence" to support her claim for damages. Plaintiffs ask the Court to exclude Dr. Ireland's testimony relating to the "lack of evidence" of loss suffered by Linda Dejana. (Motion, Doc. No. 146, pp. 4-7)

Under Daubert, "district courts are to perform a 'gatekeeping' function and insure that proffered expert testimony is both relevant and reliable." Eubanks v. Cottrell, Inc., 2007 WL 172566, at *1 (E.D.Mo. Jan. 19, 2007) (quoting Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997)). On the record made, the Court finds Dr. Ireland's approach to analyzing loss of financial support in this case is not a reliable measure of damages and, therefore, not relevant. Ireland relies

solely on the Dejana tax returns from 2003-2011. His simplistic comparison of AGI before and after Philip Dejana's death does not account for the sources of income that comprise AGI, and fails to separate Philip Dejana's earnings from Linda's. Collateral sources of income to Linda Dejana following her husband's death are not relevant to her claim of lost economic support and should not be considered in an analysis of loss of support. See generally Overton v. U.S., 619 F.2d 1299, 1306 (8th Cir. 1980); Moore Automotive Group, Inc. v. Lewis, 362 S.W.3d 462 (Mo.Ct.App. 2012). Dr. Ireland was unable to point to any support for his approach in the economics literature (Ireland Depo., Doc. No. 146-1, 88:9–89:6, 117:12-122:2), and could not recall another case in which he testified as to loss based on the income of the family unit as a whole and not solely on the decedent's income. (Id., 16:19-18:6; 76:3-22)

Because Dr. Ireland's family income methodology is neither a reliable nor relevant measure of damages, the Court will grant Plaintiffs' motion in part and exclude Ireland's testimony regarding the "lack of evidence" of loss suffered by Linda Dejana.

With respect to the Graffs, Dr. Ireland opines they have not experienced an economic loss because there appears to be no basis under Missouri law for recovering for a "net loss of future accumulations to an estate." (Report of Dr. Ireland, Doc. No. 146-2, pp. 5-7) Noting similarities between Missouri and Idaho's wrongful death statutes, Ireland references an Idaho Supreme Court case, Pfau v. Comair Holdings, Inc., 135 Idaho 152 (2000), rejecting an inheritance claim on the basis that decedent must have had a legal obligation to provide for a survivor to recover wrongful death damages under the Idaho wrongful death act. (Id., p. 6) Ireland also assumes that Kevin Graff would likely have married his girlfriend and changed his will to make her his primary beneficiary as opposed to his brother and sisters. (Id., p. 7)

Plaintiffs argue Dr. Ireland's opinions on the legal basis for their claim are inadmissible because they invade the Court's responsibility to instruct the jury on legal principles governing the case. (Motion, Doc. No. 146, p. 14) As discussed above, a beneficiary's loss of an expected inheritance, if properly supported by the evidence, is recoverable as an element of damages under Missouri's wrongful death statute. Moss, 562 F.Supp. at 874 (internal citations omitted). Because it is not appropriate for experts to draw legal conclusions or interpret laws, see In re Genetically Modified Rice Litig., 2010 WL 2326036, at *5 (E.D. Mo. June 7, 2010), the Court will exclude Dr. Ireland's testimony in this regard.

Plaintiffs also argue Ireland's opinion that Kevin Graff would likely have married and changed his will is speculative, unsupported by the evidence, and overlooks the professional standard to take the decedent "as you find him." (Motion, Doc. No. 146, p. 14) The Court will grant Plaintiffs' motion to exclude Ireland's opinion regarding the likelihood that Kevin Graff would marry, however, that issue may remain a question of fact for the jury. Whether the Graff Plaintiffs would have continued "to be the natural object of [Kevin's] . . . beneficence" had he lived to his life expectancy is a question for the jury to determine. Moss, 562 F. Supp. at 875.

**Brant Savander, Ph.D., P.E.**

Dr. Savander was retained by Defendants to opine on the boat's speed, structural performance and design. He was asked to address the following technical questions: 1) did the "heavier and more powerful engines" contribute to the loss of control of the boat; 2) what was the boat speed at the time of water entry; and 3) what is the structural performance of the hull and canopy system, with and without the window bars, while being subjected to the loads encountered during the accident. (Savander Report, Doc. No. 168-2, p. 10) Savander opined that the new

higher power engines installed in the boat increased the top speed from 120 mph to approximately 155 mph and added roughly 400 lbs in weight to the boat, thereby increasing the margin for error afforded its operators. (Id., p. 16) Savander further opined that the cause of the accident was due to Decedents losing control of the boat. (Id.)

Savander performed more than 100 computer simulations using a CFD software program known as Starccm+, and then provided data from four simulations, one each for the assumed speeds of 100, 120, 140 and 160 mph, which he felt looked most like the Kennedy photograph sequence[7], to Dr. Anthony Caiazzo for structural analysis.

**Anthony Caiazzo, Ph.D., P.E.**

Dr. Caiazzo was also retained by Defendants to opine on the boat's speed, structural performance and design. Caiazzo was asked to address the overall structural design of the boat and review the engineering methodology used by Plaintiffs' experts to reach their findings. (Caiazzo Report, Doc. No. 138-13, p. 4) Based on his analyses, Caiazzo concluded that "[g]lobal finite element analyses of the [boat], under normal running attitude, side hull slamming pressures and topside deck loading do not indicate any design deficiencies." (Id., p. 31) Caiazzo took Savander's four CFD simulations and created his own series of structural analyses using another software program known as ABAQUS. He visually compared the resulting computer generated damage predictions, depicted as different colors on a map-like graphic, to the post-accident photographs, and concluded that the map for the load case which Savander titled "140 mph" looked most similar to the actual damage. (Id.) Lastly, Caiazzo performed an FEA structural

---

[7] The sequence of photos taken by Mr. Kennedy at the scene of the accident is shown in Images 1-8 of Figure 14 in Dr. Savander's report.

analysis of the canopy and polycarbonate region, with and without the window bars, again using the four CFD estimated pressure cases from Savander, and concluded that window bars "reduce the peak inward deflection of the transparency such that it would have remained stable" at speeds of 140 mph. (Id.)

In support of their motions to exclude Savander and Caiazzo, Plaintiffs argue that neither one have any background or experience with powerboats, canopy safety systems, polycarbonate transparencies, or materials failure analysis. Plaintiffs also take issue with the reliability of their methodologies in that neither CFD nor FEA has ever been used to analyze materials failure, accident reconstruction or forensic engineering in the context of a high-speed boating accident.

It is well settled that an expert need not have experience with the particular product at issue to be qualified. Appropriate engineering background and experience in a particular field can be sufficient to qualify the expert. Stone & Alter Real Estate Co. v. Hobart Corp., 2003 WL 25694932, at *3 (E.D.Mo. Mar. 18, 2003). See also Morton v. Homelite, Inc., 183 FRD 657, 660 (W.D.Mo.1998) (mechanical engineer and experience with fuel containment and leak avoidance in aerospace industry qualified expert in design defect case involving multipurpose saw). The Court finds Drs. Savander and Caiazzo are qualified by education and experience to testify as experts in this case. The Court further finds their testimony "[g]rounded in the methods and procedures of science."[8] Daubert, 509 U.S. at 590. Disagreement with the assumptions and

---

[8] CFD is a branch of fluid mechanics that uses numerical methods and algorithms to solve and analyze problems that involve fluid flows. (*www.ata-3.com/services/computational-fluid-synamics-cfd* (December 12, 2013)). FEA is computer modeling of products and systems in a virtual environment, for the purpose of finding and solving potential or existing structural or performance issues. (*www.plm.automation.siemens.com* (December 12, 2013)).

methodology used does not warrant exclusion. <u>Synergetics, Inc. v. Hurst</u>, 477 F.3d 949, 956 (8th Cir. 2006). Plaintiffs' motions to exclude the testimony of Drs. Savander and Caiazzo will be denied.

**Christopher Long, M.D.**

Dr. Long is a forensic toxicologist who opines that THC concentrations in Graff's postmortem blood samples evidence marijuana use within three hours of the accident and that Graff was impaired at the time of the accident. (Long Report, Doc. No. 165-3, pp. 3-4) Plaintiffs take issue with Dr. Long's reliance on the results of postmortem blood samples and his failure to address or rule out postmortem redistribution to explain the presence of THC in Graff's blood. (Motion, Doc. No. 165, p. 6) Plaintiffs also challenge Long's application of the methodology discussed in two articles authored by Marilyn A. Huestis, et al. ("Huestis works"). (<u>Id</u>., pp. 9-12) Finally, Plaintiffs argue Long's testimony should be excluded because of its prejudicial impact. (<u>Id</u>., p. 15)

As a general rule, the factual basis of an expert opinion goes to the weight of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. <u>Larson v. Kempker</u>, 414 F.3d 936, 941 (8th Cir. 2005) (citing <u>Hose v. Chicago Northwestern Transp. Co.</u>, 70 F.3d 968, 974 (8th Cir. 1995)); <u>Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.</u>, 356 F.3d 850, 858 (8th Cir. 2004) (citation omitted). On the record made, the Court finds Long's testimony is "[g]rounded in the methods and procedures of science," and will therefore, deny Plaintiffs' motion to exclude his opinions and testimony. <u>Daubert</u>, 509 U.S. at 590. Plaintiffs' argument that Long's opinions should be excluded as prejudicial is more appropriately raised in a motion in limine.

**B. Defendants' motions to exclude expert testimony**

**Eric Greene**

Greene, a naval architect and specialist in marine composite construction, was retained by Plaintiffs to ascertain the cause of the boat's structural failure and the cause of death. (Greene Report, Doc. No. 138-15, p. 4) Based on his forensic engineering and failure analysis investigation, Greene concluded that the design and construction of the boat's canopy and deck did not comply with industry guidelines and standards relating to enclosed cockpit canopies for racing series boats, i.e. the Lavin Guidelines,[9] and that the boat had a number of design defects that contributed to the failure of the cockpit canopy system. (Id., pp. 7-10) In particular, Greene concluded that the boat's deck and canopy structure was not designed to withstand the loads of capsizing. (Id., p. 10) He also reported on a number of indications that the transparency did not fail from impact with the water, including but not limited to "numerous shear failures at bolted connections, single failed cap fastener is failed on side away from transparency edge, missing polycarbonate in area of starboard roll bar support, fracture pattern in polycarbonate transparency, and no fractured polycarbonate found in cockpit." (Id., pp. 10-11)

Defendants seek to exclude Greene's report and testimony on grounds that he did not adequately test or inspect the boat, attempt to recreate the accident or predict the actual pressure loads that occurred during the accident, or rule out alternative explanations for the canopy failure.

---

[9] On February 13, 2013, Greene issued a supplemental report based upon his review of the 2002 Lavin Guidelines, the version that applied when Defendants built the subject boat. (Greene Supplemental Report, Doc. No. 158-1) Greene found that specific recommendations cited in the 2002 Guidelines were not followed in the design and construction of the subject boat. (Id., pp. 3-5)

The lack of inspection goes to the weight of Greene's testimony and not to its admissibility. See Lauzon v. Senco Products, Inc., 270 F.3d 681, 694 (8th Cir. 2001) Further, an expert's testimony is not precluded by the failure to rule out all other possible theories of the event; the possibility of other explanations goes to weight, not admissibility, of testimony. Id. Defendants' motion to exclude Greene's opinions and testimony will be denied.

**Scott Graham, P.E.**

As discussed in detail above, Graham was retained to rebut Savander and Caiazzo's CFD and FEA analyses. Defendants challenge Graham's rebuttal opinions as unsupported by any testing or computer modeling of his own. Although Graham claims certain variables would have changed or altered Savander and Caiazzo's results, Defendants argue he did not look at the inputs or run any computer modeling with the Starccm+ or ABAQUS programs as part of his critique. Again, these arguments for exclusion go to the weight, not admissibility, of this testimony. Raising questions about, and exposing gaps in analyses and conclusions is a task for Defendants to perform in front of a jury. Hanrahan v. Wyeth, Inc., 2012 WL 2395986, at *4 (E.D. Mo. June 25, 2012). Defendants' motion to exclude the opinions and testimony of Graham will be denied.

**Anand Shah, P.E.**

Shah, a materials expert, was retained by Plaintiffs to examine the failed enclosed cockpit/canopy, including the windshield, and provide technical opinions regarding the cause of the boat's failure. (Shah Report, Doc. No. 191-1, p. 3) Shah identified several design defects in the boat which he opined directly contributed to the failure of the cockpit canopy system, including:

- the use of a wraparound style, large, continuous one piece, monolithic polycarbonate windshield, of nominal half-inch thickness, in a bolted configuration, in which the windshield can experience structural loading

- canopy structure insufficiently reinforced to distribute and share structural loads

- unreinforced, unsupported section of canopy structure above the windshield can collapse in the event of direct impact with water in a rollover accident

- sandwich construction of the composite in the deck, canopy, and sides of the boat is not as structurally efficient as the bottom of the boat

(Id., p. 10). Shah concluded that the canopy design defects should have been foreseeable, and could have been easily eliminated by Defendants. (Id.) Further, the windshield was not strong or stiff enough to accommodate load sharing with the composite canopy, and the window bars solution was not a reasonable response of a manufacturer and not properly engineered to overcome the design defects. (Id.) Finally, in light the evidence of the windshield fracture process, and his evaluation of the window roll bar design, material, and roll bar installation, it was Shah's opinion that the canopy failure would have occurred even if the window bars were present at the time of this accident. (Id., p. 11)

Defendants challenge Shah's opinions as unsupported by scientific testing or analysis. They point to the absence of computer modeling or accident reconstruction, and that no predictions were made regarding the pressure loads the boat might have been subjected to. Again, these arguments for exclusion go to the weight, not admissibility, of this testimony. See Larson, 414 F.3d at 941. Defendants' motion to exclude the opinions and testimony of Shah will be denied.

**Lane Hudgins**

Ms. Hudgins is a forensic economist retained to opine on Plaintiffs' economic loss. In her initial report[10], Hudgins estimates Linda Dejana's total economic loss through her husband's projected retirement and life expectancy, including lost earnings and employment benefits net of personal consumption and lost household services, to be approximately $4,610,556. (Hudgins Report, Doc. No. 201-2, p. 5) Hudgins calculated Philip Dejana's base earnings by averaging his combined W-2 wage earnings and S-Corporation distributions for the period from 2003 to 2007. (Id., p. 3; Supplemental Report, Doc. No. 201-1, p. 3)

Defendants maintain that Hudgins' testimony should be excluded because she does not have the underlying support on the record on which to base her analysis. In particular, Defendants argue that Hudgins' calculations are not reliable because she has not deducted the income of the Dejana S-Corporation interests and investment properties, which they characterize as strictly passive income. Defendants also contend Hudgins lacks details about the Dejana businesses and how Philip Dejana was paid by the various S-Corporations. Plaintiffs respond that Hudgins considered all sources of Philip and Linda Dejana's income and separated active "wage" income from passive income. Plaintiffs dispute that all of the S-Corporation earnings were passive. (Response, Doc. No. 177, pp. 4-14)[11]

---

[10] Hudgins supplemented her report after being provided with additional material, to clarify certain aspects of her report and evaluate Ireland's report, but did not change her estimate of economic loss suffered by Linda Dejana. (Doc. No. 201-1, p. 2)

[11] In support of their response, Plaintiffs submit an Affidavit of Dr. Hudgins wherein she responds to certain statements made in Defendants' motion to exclude her testimony. (Affidavit of Dr. Lane Hudgins, Doc. No. 177-2) Defendants request the Court strike Hudgins' Affidavit, arguing it impermissibly supplements her testimony and opinions after the close of expert

Whether there is a sufficient foundation for Hudgins' opinions and testimony is not clear from the record at this point in time. Generally, questions as to the sources and bases of the expert's opinion affect the weight, rather than the admissibility of the opinion and are properly left to the jury. See Larson, 414 F.3d at 941. Thus, Defendants' motion to exclude Hudgins' opinions and testimony regarding losses to Linda Dejana will be denied.

With respect to the Graffs, Ms. Hudgins calculated the net present value of accumulations to Kevin Graff's estate at $834,072. (Hudgins Report, Doc. No. 161-4, p. 6) She calculated these net lost accumulations by identifying Graff's earnings, income and benefits that could have become part of his estate had he lived, then deducting a percentage for personal consumption.[12] Defendants argue Hudgins' testimony is inherently unreliable because lost accumulations to an estate are not recoverable under R.S. Mo. § 537.090. (Motion, Doc. No. 161, pp. 9-12) As discussed above, the Court has found that lost accumulations to beneficiaries is a recoverable element of damages. Defendants' motion to exclude the opinions and testimony of Hudgins regarding the Graff Plaintiffs will be denied.

**Donald Barceloux, M.D.**

Dr. Barceloux is a medical toxicologist retained by Plaintiffs to interpret Graff's post mortem toxicology results, and specifically his THC level at the time of the accident. Dr.

---

testimony. (Reply, Doc. No. 201, p. 3) Striking a party's pleadings is an extreme measure, and, as a result, motions to strike are viewed with disfavor and infrequently granted. Stanbury Law Firm v. Internal Revenue Serv., 221 F.3d 1059, 1063 (8th Cir.2000) (internal quotations and citations omitted). The Court will instead consider the Affidavit as additional argument.

[12] Hudgins supplemented her report to address Dr. Ireland's assumptions and opinions on whether lost accumulations to an estate are allowed in Missouri and Graff's marital status at the time of his death. (Doc. No. 161-5)

Barceloux opines that the detectable amount of THC in Graff's postmortem blood resulted from postmortem changes rather than the use of marijuana during a time likely to cause impairment at the time of the accident. (Doc. No. 162-1, p. 9) Defendants take issue with the medical texts Barceloux relied on, the lack of clinical studies to support his theory, and incomplete witness testimony. The factual basis of an expert opinion goes to the weight of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Archer Daniels, 356 F.3d at 858. On the record made, the Court finds Barceloux's testimony is "[g]rounded in the methods and procedures of science," and will therefore, deny Plaintiffs' motion to exclude his opinions and testimony. Daubert, 509 U.S. at 590.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Randy M. Scism's Motion for Summary Judgment [148] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Marine Technology, Inc.'s Motion for Summary Judgment [154] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment [166] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Defendants' Proposed "Sur-Rebuttal" Expert Reports of Brant Savander and Anthony Caiazzo [138] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude Parts of Thomas Ireland's Expert Testimony [146] is **GRANTED** consistent with the Court's Memorandum and Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motions to Exclude Testimony and Opinions of Anthony Caiazzo [155], Christopher Long [165], and Brant Savander [168] are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motions to Exclude Expert Testimony of Eric Greene [158], Anand Shah, P.E. [159], Scott Graham, P.E. [160], Lane Hudgins [161], and Donald Barceloux, M.D. [162] are **DENIED**.

Dated this 20th day of December, 2013.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE